Good morning, your honors. May it please the court. My name is Richard Salgado, and I'm here representing Shuffler Group USA and FAG Bearings, LLC. There's really two primary issues I'd like to discuss with the court today, and I'm just going to discuss those. This is Judge Loken. Could you speak a little closer to the mic? I certainly can. I will lean over and do my best on that. There's two primary issues that I'd like to discuss with the court today, and the first, I'll take those in the order of our briefing, and the first is judicial estoppel. And judicial estoppel is an extraordinary relief that is only granted, it shuts down the truth-seeking function of the court, and for that reason, as such a severe penalty, it is only used when two positions- I can't hear you, counsel. I apologize, your honor. You can raise the podium if you like. The whole podium goes up. Sorry. I think it's as high as it goes, but I will lean over. All right, can you hear me now, Judge Loken? Yes, very clearly. All right, I will stay in this position. So, as far as judicial estoppel goes, it is only used when two positions are clearly inconsistent. If two positions can be reconciled, it does not apply. That is the standard that is the Supreme Court and this court, that if those two positions can be reconciled, it does not apply. In this case- According to what law are you referring to? U.S. Supreme Court, Stallings. Are we looking at, this is a diversity case? This is a diversity case. So, are we looking at federal law? Are we looking at Missouri law? Well, it's U.S. Supreme Court. So, to that extent, it's Stallings versus, I forget the last part of that one, but it's a Stallings decision for the U.S. Supreme Court. I believe it's the same under Missouri law as well. I can provide that site if you would like later. But, I mean, this is essentially the standard. I've not seen a case where post the U.S. Supreme Court decision, judicial estoppel applies to positions that are not clearly inconsistent. If the positions can be reconciled, there's no reason for judicial estoppel. There's no fraud on the court and there's just no reason to apply it. And the problem we have in this case is these two positions are not inconsistent. The two positions at issue here are positions that Scheffler has not abandoned. Both positions Scheffler would assert today, tomorrow, five years from now. These positions are both correct. The first position, they're taken under different legal standards. The first position was taken in a court of international trade proceeding. It was an anti-dumping issue. And in that case, Scheffler accurately took the position that it was the successor to FAG Bearings, LLC. And it was the successor because for purposes of anti-dumping, what matters is the product. There'd been an anti-dumping order that domestic producers of ball bearings were entitled to duties paid by foreign producers. Scheffler's position was it was now making that same ball bearing that had been subject to that duty. And because it was making that a test under commerce, a change circumstance review, and it looked to the product line. It looks to that product line and it's forward looking. The second position at issue here is one the district court here never reached. It's one the district court never really considered. And that is whether Scheffler was the successor for all purposes, for tort liability, to FAG Bearings. And that is a fundamentally different test. It is a fundamental part of corporate law in America that when a company buys another company, it does not assume that company's liability unless it expressly chooses to do so. Isn't there a difference between the Missouri law, judicial estoppel, and the federal law? Your Honor, on that, I do not believe that the court here was quoting entirely federal case law in applying this. And to the application of that, my understanding is judicial estoppel no matter what does not apply to statements that are consistent. Well, okay, I understand what you're saying. But as a legal matter, that's what we're here to discuss. Sure, absolutely, Your Honor. Isn't it our duty to figure out what the Missouri law is in this instance? That very well may be true, Your Honor, yes.  That is correct, Your Honor. And I think there are significant differences between the two with respect to prejudice, for instance. Well, there's certainly other factors. There's other factors you go to beyond that first threshold factor being inconsistent. But if the statements are consistent, that analysis never begins. Whether we get to the other additional factors of prejudice, detriment, things like that, those certainly, there's room for play in those. But I'm really focusing on that very first factor on which I don't believe any court has applied judicial estoppel to statements that are consistent. Okay, well, I think the Missouri law might be more favorable to you than the federal law, but it's your case. Well, Your Honor, by all means. I'm simply focusing just on the, again, to detriment, I don't believe there'd be a detriment here either. But simply put, the court here never reached, never reached that threshold question of whether under Missouri law, and this absolutely is Missouri law, is this test for successor liability. The case there, Edward B. Black Twigg is, from this court I believe, interpreting Missouri law. And that is absolutely on point saying that here's the test. Whether two companies, whether one is a successor to another for liability purposes and tort, here's the test. And that test was never reached. That test was never compared here to the test that was at issue in the first proceeding. And so based on that, the district What's the first, and the first proceeding you refer to is the Court of International Trade Anti-Dumping Proceeding. Well, what about the District of Connecticut proceeding? Well, the Euro-Atlantic case? Well, the Euro-Atlantic case, there's a couple of things. First, as a threshold issue on that one, that would not be a basis for judicial estoppel regardless because the court never relied upon it. Again, in that instance, one of the requirements of judicial estoppel would be that the court actually relied upon it. And here, there's no indication that the ruling, the case went away without any ruling on that. The court never accepted the position. But I don't want to leave it at that because that position was also consistent. What happened in that case was that F.A.G. Bearings Corporation was the party that was sued. That was the only party that was sued in that case. And F.A.G. Bearings Corporation did not exist. It was a non-existent entity that had been sued. And so the statement that was made in Euro-Atlantic was F.A.G. Bearings no longer exists. That entity does not exist. And that was a correct statement. So again, going back to this, but even again, even if it weren't, that would not be a basis for judicial estoppel. But I do want to make it very clear to the court. Well, what about the statement that F.A.G. Bearings is not a separate legal entity from Schaeffler Group, U.S.A.? And that is, that is from the, the... That's from the affidavit? Yes. In your... The affidavit of the General Counsel for Schaeffler Group, which was filed in the Connecticut case, the District of Connecticut. Exactly. And again, going back to that, the short answer is that case would not be a basis for judicial estoppel because no court ever relied on that statement. And so as one of the predicates for judicial estoppel to apply, that would not apply. But again, what the General Counsel there really was trying to say is this is now part of... He was trying to essentially express that F.A.G. Corporation no longer existed. It was gone. F.A.G. Bearings LLC had become a subsidiary of Schaeffler. There is absolutely... Do you have a Missouri case, a Missouri case discussed in judicial estoppel that states that proposition that the first, that the first court must rely on the representation? Not at my fingertips, but I would be happy to submit that to the court afterwards, Your Honor. Because I don't see in the Missouri judicial estoppel opinions that I've looked at, I don't see that as a requirement. Well, again, I would submit in that the district court did not rely upon that in its ruling, but I'll also say that the statement there again was meant to simply express that these companies are now a parent subsidiary relationship and it's not a separate entity. I mean, really it's just a matter of, almost a matter of fairness. It is not fair to allow an entity... I can't hear anybody here. Excuse me, I'll speak louder, Judge. Is it really, isn't this doctrine really essentially a matter of fairness that it's not fair to allow an entity to take an inconsistent position in before one court and then later take another position before another in an effort to obtain a benefit? That is correct, Your Honor. And our position here is they're not inconsistent positions. That's really the bottom line here is that these are not inconsistent positions. They are consistent and we can... And the real challenge here is the district court never actually compared the standards, never actually looked at what was being said. We took a very surface reading here and said, here they said they're a successor and here they said they're not a successor. Those are inconsistent judicial estoppel applies. But there's a deeper analysis here that frankly was never done. Counsel, on that basis, you have passed awfully quickly over the anti-dumping question. I know a fair amount about that conceptually. The statute is a non-tariff barrier. It is not intended to protect products. It's intended to protect American producers. Correct. Are you, and I don't know what the, I haven't read the Court of International Trade precedents, but are you saying that a foreign parent of a U.S. subsidiary can claim the benefits of the anti-dumping protections for U.S. producers? Your Honor, if I understand the question, I wasn't hearing everything perfectly on that, but what I'm saying is the standard for anti-dumping... Well, successor liability usually focuses on parent, it usually involves parent-subsidiary relationships. So are you saying that a foreign parent independent of a U.S. subsidiary claim the benefits of being a complainant under the anti-dumping law? What I'm saying is that under the anti-dumping law, there's a different test. It's the change circumstance test that the Department of Commerce uses. Well, that's, I just don't believe, I haven't read the authorities, but I believe you are seriously understating the U.S. protective aspect of that statute. Well, no, Your Honor, I agree with that, absolutely. What I'm saying is that one of the primary components, though, of that test... All right, but this time under the representations made to the Court of International Trade, the opposing counsel's brief asserts, and I believe this is correct, that you can't just be a foreign parent of an independent U.S. subsidiary and be honored as an anti-dumping act complainant. Therefore, the representations to the Court of International Trade, the former F.A.G. Barings, no longer exist. We are a U.S. producer. That's pretty insignificant. Well, Your Honor, the representation there, again, it is a multi-part test. There's more to it. It looks at the product line. It looks at various other factors, but they are different tests, and meeting one test... I don't care if they're different tests. The question is whether they're inconsistent positions. Yes, I understand, Your Honor. Define for me the position intended to be taken and the representation to the Court of International Trade. The representation, Your Honor, to the Court of International Trade was that Shuffler Group had taken over the product line, was making the same ball bearings, was selling to the same customers, and essentially had replaced F.A.G. Barings for purposes of that product, and subject to the various tests. I don't have the exact tests listed in front of me right now. Okay. Give me the record site that would establish the representation was that narrow. Well, the representation, Your Honor, in the pleading was much simpler. The representation of the pleading was Shuffler Group is a successor here to F.A.G. Barings. It's in the context that it matters, and again, it was not written out. The representation where? I'm talking about the representations to the Court of International Trade. Yes, Your Honor. And that's what I'm saying is in the Court of International Trade, we're really focused on a single sentence. There's one or two sentences that deal with it. Most of that petition to the Court of International Trade was about a totally different issue. I'm not focusing on the one sentence. I'm asking you to state and give a record site for the position, the legal position taken with the Court of International Trade. Beyond simply the jargon in that, it's that non-legal founding of sentence that's being focused on. Yes, Your Honor. I don't have a record site as to that. I don't. I have the law of anti-dumping that we cite in our brief, but I don't have a specific record site as to that. Okay. Okay. At this time, Your Honor, as I do say, my time is quickly going. I would like to say a few words about causation, if I may. On the causation issues here, fundamentally here, the case law is right v. Willamette and its progeny, that essentially a plaintiff, in order to show causation, must establish exposure to a level of the chemical that is shown to be capable of causing their illness. The problem we have here in this case is that Curtis Kirk was exposed, well, the best evidence they have of this, they have an expert who testified that certain immune-sensitive mice, when exposed to 500,000 parts per billion of TCE, of trichloroethylene, exhibit symptoms like autoimmune hepatitis. They also have that same scientist testified that when those same mice were given 100,000 parts per billion, again, this is over the human equivalent of 24 years of life, 20 to 24 years. That's obviously much less than that for a mouse. They did not exhibit AIH-like symptoms. And so with that, Ms. Kirk was allegedly exposed to somewhere around 14 parts per billion of trichloroethylene. And the problem we have here is there's really no way to connect those dots. There's no way to extrapolate 500,000 down to 14 parts per billion. This is a very difficult situation in that regard. It's ultimately speculative. Mr. McLean, in his closing argument, acknowledged this to the jury when he told the jury, when you come to the instruction, we're going to go over it, where you have to find that she was exposed to sufficient TCE, you don't have to find any certain level, just in your mind, what is sufficient. The problem here is that's just simply not it. What the jury guesses or speculates is not sufficient to satisfy the way, well, going from that, then you ask, well, how, where do we go from there? If there's no way to satisfy that standard, then differential diagnosis would be the next option. The problem we have here is that there was no differential diagnosis done. First of all, a differential diagnosis would not have been proper here. In Bland v. Verizon Wireless, this court stated that where the majority of the causes of an illness are unknown, a differential diagnosis does not the illness was exercise-induced asthma, and the court said a differential diagnosis here simply is not available. But even if it were, the plaintiff's experts did not do a differential diagnosis in this case. What Ms. Kirk's brief does is try to hide this fact. On one of the pages of their brief, they actually have a long block quote from the district court, where the district court purportedly analyzes the differential diagnosis. But what they've done there is use brackets to who was never called in this case. No differential diagnosis was done by either of the experts. And frankly, there's nowhere else to go with this. Also, in the district court, was it your position that the experts couldn't testify at all, or only that they couldn't give certain opinions? And if the latter, what opinions are we focusing on? Well, Your Honor, frankly, it's a little bit of a chicken or the egg situation here. And the experts here should not have been able to testify. It was more likely than not that TCE caused her illness. They should not have been able to give that testimony because they neither satisfied being able to say what amount TCE can cause human AIH. They have no idea. Dr. Zizek said a small amount. That's an indefinite amount. Small could be $100,000. It could be $10,000. We don't know. So there was no answer there, and they did not do differential diagnosis. And frankly... Counsel, I haven't heard an answer to the question. If you argued they couldn't testify at all, it seems to me they certainly could give consistent with testimony. Yes, Your Honor. But what part did you properly narrow your request to release to the district court? Your Honor, we sought to exclude those witnesses' testimony in our Daubert motion. That was denied, and they nevertheless testified. Whether it was in their... Stop, stop. Was it a broad motion to exclude testimony, period, or was it aimed at particular opinions? There were multiple bases that were sought to be excluded. There certainly were. It was certainly broad in some ways. Did you specifically argue to the district court that specific causation opinions should be excluded? Your Honor, even having read that recently, I'd have to look back to confirm. I don't want to misrepresent what was said in those, but I believe we did move to exclude that specific causation opinion. So to that end, at this point I have one minute left, so I would like to have a minute for rebuttal, if there's no other questions at this time. Mr. McClain. Good morning, Your Honor, and good morning, Judge Loken. If I speak this loudly, Judge, will you be able to hear me? Perfect. Thank you. You're welcome. Let me start and hopefully more briefly deal with this issue of judicial estoppel that counsel spoke about. Judge Loken is absolutely correct in regard to the representation made to the Court of International Trade. It was not qualified, and it was not based upon successor liability, and here's the reason. The issue that was confronting the International Court of Trade was whether or not FAG bearings slash shuffler were capable of receiving payments under the anti-dumping statute. FAG shuffler's position was the statute has passed, which said that if you did not advocate for this anti-dumping legislation to be passed, you cannot claim the benefits. Counsel, let me get specifically to my problem with your position. It seems to me that the representation to the Court of International Trade was perfectly consistent with a purchase of substantially all of the assets of FAG, whatever entity, but not without the assumption of liabilities. Is that wrong? Yes, Judge, because the issue that was being discussed was the constitutional rights of FAG bearing to not advocate for this bill, and that basic position that they took was you cannot restrict our constitutional rights to advocate or not for this position by this law. That position ultimately was accepted. Constitutional rights, as you've written, Judge Loken, are personal. They're not transferable, and they had to take the position, and this Judge Kayes recognized they would not have had standing to assert the I'm sorry, Judge. Please wait. Okay. That's a non-responsive answer because I assume you know that a purchase of substantially all of the assets eliminates the seller. Correct, Judge. That is correct, but that does not give you constitutional... Two entities become one. Yes, that is absolutely true. All right, so it seems to me that that's exactly what is... The representations quoted in the pleadings in this case that Schaeffler made to the CIT are consistent with that. The former U.S. corporations no longer exist. We are that entity. That is true, and more. We have their succeeded in... That's not a liability. That's an asset. That is correct, but you remember the test... If they did not assume the liability, they could still make that representation to the CIT, right? Yes, except that if you are that entity, you accept liabilities. You do not have the option, Judge, to not be the entity for all purposes and have the entity's rights. Well, I guess you... Either corporate law has changed dramatically or when I practiced it, you aren't aware of... You don't understand it because there are protections, of course, built into creditors for that kind of transaction, but it is not barred. No, you're right about that, Judge, but when we're talking about constitutional rights, we're talking about constitutional rights. They're not contractual rights that can be limited in those fashions. Counselor, I don't care about constitutional rights. I care about this case. So if there was a purchase of substantially early assets and no assumption of liabilities, then either your client is protected only to the extent that applicable corporate law protected it, or you can prove successor liability under either the federal environmental or laws or state law. It seems to me that's the answer here and it's not a judicial estoppel answer. What's wrong with that analysis? Well, remember, Judge, what you held in Stallings. Stallings holds that judicial estoppel is not merely a legal test. There's a subjective element to it. The question is, does the court believe whether or not the parties are taking inconsistent positions before it to its benefit? Here's what Stallings says. The district court is in a better position to determine if judicial estoppel applies because determining whether a litigant is playing fast and loose with a court has a subjective element and its resolution draws upon the observation of the lawyers and their litigation strategies. Now, that's the basis upon which Judge Kays made this determination, not as a simple legal matter of corporate law, but whether or not the lawyers in front of him were playing fast and loose on this issue. And he believed they were. And so what you say in your holdings is that we apply an abuse of discretion standard to this determination because only the court can determine whether they're playing fast and loose. And playing into this issue, Judge Arnold, was the fact that they never raised any of these issues in response to our assertion that they are judicially estopped from saying this. I understand, but as I understand it, under Missouri law, it's not enough to impose an inconsistent position. There also has to be some prejudice shown that the other party somehow acquiesced in that position earlier to its prejudice. Isn't that true in the Taylor case? Yes, it is. But the prejudice in this case, and I believe that the New Hampshire case that we cite is the controlling case. The defendants agreed with this in the court below. They didn't raise that issue in their briefing before you, as you know. In the New Hampshire case, which we all agreed were controlling for both purposes before Judge Kaye and this case, the standard is that it's unfair to allow the party to change positions, not whether we suffered prejudice. And in this case, because they had asserted that, and because, in fact, throughout this case, it was Scheffler who was in control of this litigation, Judge Kaye's believed that it was unfair for them to change their position. And in fact, the difference is, excuse me, counsel, but the Missouri Taylor case didn't rely on New Hampshire. It relied on an earlier Supreme Court case. Is that right? Yes, but the New Hampshire case is the controlling authority, Judge, that we all pointed to and recognized in the case. I think it is. Yes, you're right. Yes, New Hampshire did change the law in that regard, and I think that maybe clarifies that issue. The issue is one left in the discretion by you of the district court. Are these people playing fast and loose with me or not? It's a legal question. Don't we review this de novo, whether the estoppel applies under the rule? Not according to Stallings. It's not a de novo ruling. It's abuse of discretion. We both agreed that that standard applies to this finding in our appeal. Well, how about this one? It's an error of law. You frequently hear that, which unfortunately turns everything on its head. An error of law is always an abuse of discretion. If the court applied the wrong standard, I don't know why we could say, oh, well, the court has the discretion to apply the wrong standard. Well, that's right. That would be true, except that the judicial estoppel issue is not a pure legal issue, as you've defined it. You said it's designed so that the court has the ability to stop parties from engaging in gamesmanship before it, and only the court sitting there making that judgment can decide whether or not that should apply. And Judge Kayes decided that, not only at the time that he made this decision, but throughout trial when the Scheffler Director of Compliance was the F.A.G. Corporate Representative. Let me follow up on that point. That's a potentially strong point. What case has ever held that even though the positions weren't inconsistent, this isn't fair, so we're going to apply judicial estoppel? Judge, I think that Stallings stands for the proposition that the court must decide whether they're inconsistent or not, and only the court can decide it unless they've abused their discretion. And I think that... Do you have an answer to my question? If the court decides they're inconsistent... If a case where a court decided they were not inconsistent positions, but nonetheless, as a matter of fairness, I'm applying judicial estoppel? No, Judge. You have to have that they took a position inconsistent with the position they're not only from the Court of International Trade decision, but also the District of Connecticut decision, which although was not the primary basis, was considered by him in making the determination that the parties were playing fast and loose before him. Could you take about a minute and talk about that, the Connecticut? Yes. In the Connecticut case, they made a representation, and as you point out in an does not have existence any longer, and that Sheffler, Inc. is, in fact, FAG Barings. And I think that that position is consistent with applying judicial estoppel in this case, and one of the basis upon that Judge Kaye's considered. And so their overall position, and even at trial, was that Sheffler and FAG were the same corporation. Their corporate director of regulatory affairs testified as FAG. Their annual report issued into evidence made that clear as well, and when she was cross-examined on the stand, she said it. So Judge Kaye's, when examining the Rule 50 motions following trial, said, I'm not going to change my ruling. You did not raise this issue in your initial briefing. I'm considering that. I'm considering what happened at trial, and I don't believe it's fair for you to change your position this way. And in Stallings, you've given him that authority. So with that in mind, let's turn to the issue of the proof of exposure in this case. Judge Loken, you asked a question. Did they raise the specific causation issue in their briefing? No, they did not. They took the position throughout the case that there was no general causation, and therefore, specific causation was not at issue. Their position... Just a follow-up. Did they object to the specific causation testimony at trial? Yes, they did. Okay. Now I got the landscape. Thank you. Okay. So the issue never was framed at trial in terms of specific causation. They weren't worried about that. They were all in throughout the entire case on general causation. They waived that argument now and concede that there was adequate evidence of general causation in this case. Instead, they attacked specific causation for tactical reasons. But at trial, their expert conceded, Judge, that she was exposed to 11 parts per billion, which was double the permissible exposure standard throughout her entire life, because they were all in on this general causation defense. Therefore, there was more than enough evidence, more than in any other case that they can cite, of continual excessive exposure for her. Now, added to that, and what led Judge Kayes to his conclusions in terms of denying their motion JNOV and motion for new trial, was the fact that we submitted the leading experts in the world. Judge Dr. Tom Zizek from Johns Hopkins, a professor of immunology who wrote a book on TCE exposures, and Dr. Ann Gilbert from the University of Arkansas Medical School, who's the leading expert in regard to TCE and autoimmune hepatitis, who's performed over 15 different animal studies and is recognized for her work and has been put on the EPA's scientific advisory panel, of which only 10 scientists in the United States are members of. They pointed out that the research has demonstrated that when the exposure is in vitro, that, in fact, there is a non-dose-specific immune-mediated response that is caused. In other words, in these immune diseases, it is not a true dose response scenario. It's more in the nature of a key that unlocks the response in the humans. And as Dr. Zizek testified, what happens is that the TCE converts liver into non-liver tissue, as far as the body's defenses are concerned. Presumably, there's some level of that exposure that, as it were, triggers a disease. So is that not under your theory? It is true that there is a level, but it's a minimal level in the experiments that is cited. A very minimal level is necessary, and the witnesses all testified she had an excessive level. Her level was twice, by their admission, three times by our admission of the EPA's permissible exposure limit to TCE. This is a matter of ordinary tort law and the law of causation. You have to show that there was some level that is likely to trigger this in a certain person, at least, a person with certain kinds of previous medical history or inherent characteristics that will cause this. And that level was, in fact, a level to which she was exposed, right? And that's what these experts testified to. She was exposed at double the permissible exposure limit, so we know that there are health effects associated with these exposures. And they testified that, in fact, in her case, because it was in vitro, much less than this would have been required to trigger it. And that's the basis, and they pointed to animal studies which showed, in fact, that effect and had a sufficient basis. I think that your right opinion, Judge, is correct on this point and is cited all over for the proposition that we don't require mathematical tables between cause and effect to be able to say, as you said, what must be had is the basis upon which a reasonable person could conclude that the exposures caused the disease. And so we have a prime example here. Judge Case, who listened to the evidence and is no pushover on these causation issues and put us through the test at all stages of this litigation when reviewing their motion for new trial, says it's not these debater points that you want to put forward that cause plaintiffs to win. It was the mountain of evidence that they presented which was more persuasive than your evidence. According to the judge, he wasn't simply basing on the sufficiency of evidence and that they've met their burden because there was sufficient evidence here. He said it was more persuasive in his order. And so to your test, Judge, in right, your question, will it persuade a reasonable person, it certainly persuaded Judge Case. The evidence was overwhelming. It wasn't some passing discussion. There was a place-by-place discussion of how much she was exposed to at every place she played in her life. There's a suggestion in the defendant's brief that you had some duty to exclude, as it were, the possibility of other causes. I think that goes too far, if I may say so. I'm not saying speaking for the court, but what about the fact that she might have gotten this disease anyway because of inherited characteristics? The inherited characteristics, Judges, are important and they discussion. It is much more likely that a person who is predisposed to autoimmune diseases gets autoimmune hepatitis from TCE. They're the persons that are most vulnerable from TCE to get it. Well, they claim that she was. Their experts put forward the position that because her mother had Graves' disease, she was predisposed. And so this is like the eggshell plaintiff issue, Judge, that you're so familiar with. Because she was in a person that was predisposed to autoimmune diseases, placing her in a TCE-laced environment. I understand your theory, but I mean, isn't there something, some considerable evidence in the record that she would have acquired this disease anyway simply as a matter of inheritance? No, not at all. And that was never the issue. The only, what defendants allude to is in a deposition, one of our experts was asked, can you guarantee that she wouldn't have had autoimmune hepatitis even if she hadn't been disposed or had been exposed to TCE? And she said, well, that's impossible to say. It would be the equivalent of this analogy since we're in football season, Judge. Merely because I was hit by the linebacker and broke my leg does not mean that at some point you have to exclude idiopathic causes. I'm talking about this particular predisposition as a possible cause. No one ever proposed that that was the only potential cause that the defendants raised with the witnesses was idiopathic. And your decisions say that as long as they've done a careful differential diagnosis, and they did both experts, both judge, both Dr. Zizek and Ms. Gilbert, then in fact, they've satisfied and they both said that in the face of her exposure, her excessive exposure to TCE to consider idiopathic doesn't make any sense. Idiopathic says it was caused by nothing. And we have a known cause that she was exposed to from birth. I understand. Thank you. Thank you so much. I appreciate the answer. Mr. Saldado, we'll move that up to two minutes. Thank you for your wrap up. Your honors, I'd first like to start out by pointing out the two points in the record, app site 0099 and app site 0125 from the Daubert motions where we sought to exclude the specific causation opinions of Dr. Gilbert and Dr. Zizek. We did move on that specifically and those are the sites where we did so. Going from that, I'd like to point out here that according to Mr. McLean's argument that Dr. Zizek, still his opinion required some amount. There was still some threshold. He said it was a lower amount. He said that it would take less. It's less relevant. Those are all relative terms. Less than what? We have 500,000 parts per billion, which is the only number that we've actually seen causing AIH-like symptoms. That's it. We're asking a jury to extrapolate down from that. There's no basis to do that here. Just none. There was no differential diagnosis done despite what Mr. McLean just said. If you go back and look at the court's ruling on this, the court never found differential diagnosis by either expert. That's just a lip-seeing out the name of the Dr. Chiodo who did do a differential diagnosis but was never called to testify in this case. Fundamentally here, there is a causation problem here. There simply is no way to get around this. Dr. McLean spoke a lot about these permissible standards, the permissible levels. That's an EPA standard and a Minnesota Department of Health standard that set much lower amounts of permissible amounts of TCE and water. That is not specific to and that is not causation evidence. That is simply setting a preventative measure for a very large range of all different kinds of illnesses saying if you go above this, we can't say you're completely safe. The studies themselves even say this is not causation. It's not clear what the standard is set for, is it? Why is that the standard? What is it supposed to prevent, as it the Minnesota one actually goes into detail on this and explaining even the EPA one. The EPA standard was set because the TCE is a carcinogen. It's carcinogenic. Therefore, the goal is zero. What the EPA does is they look and say, realistically, what can we do? We can't say zero because that's unrealistic. There was a standard that was set to prevent cancers. It was cancer and autoimmune diseases and other illnesses. All kinds of illnesses. They basically say, okay, five parts per billion, that's a realistic number we can go with. But including autoimmune diseases. Absolutely. But to cross it does not mean you're in a causation territory either. Absolutely. Exactly. That was admitted into the court. Nevertheless, Mr. McLean used that as a surrogate for evidence in this case. He extrapolated it out and told the jury, there's a chart we have in our brief duplicating what was shown to the jury, 50 times this, 40 times this amount. That's not a causation standard. My time is gone. There's no further questions from the court. Thank you. All right. Thank you, counsel. The case is submitted.